

EOD
10/13/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEO ROGERS DUGAS** | § | |
| xxx-xx-3642 | § | Case No. 94-10027 |
| **and VALERIE DARLENE DUGAS** | § | |
| xxx-xx-3409 | § | |
| 15311 Hummingbird Ln., Baytown, TX 77520 | § | |
| | § | |
| Debtors | § | Chapter 13 |

## MEMORANDUM OF DECISION[1]

This matter came before the Court for the re-hearing of the "Motion to Disgorge

and Transfer of Funds into the Registry of the Court" as well as certain new requests for

relief contained in a "Motion to Revise and Re-Enter August 24, 2001 Judgment and

Request for Punitive Damages" filed by the Debtors, Leo Rogers Dugas and Valerie

Darlene Dugas ("Debtors") in the above-referenced case. This memorandum of decision

disposes of all issues pending before the Court.[2]

## Factual And Procedural Background

To describe the factual and procedural background of this controversy as

labyrinthine would be a considerable understatement. On December 3, 1992, a company

---

[1]This Memorandum of Decision is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

[2] This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has the authority to enter a final order regarding this contested matter because it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A) and (O).

called Howell Crude Oil Company ("Howell") filed an original petition in interpleader in

the County Civil Court at Law No. 1 of Harris County, Texas (the "State Court") under

cause no. 611,156 which was styled Howell Crude Oil Company v. JSB Petroleum, Inc.

and Claron Corporation (the "Howell Action").[3]  The Howell action was filed to

determine competing claims to proceeds arising from the sale of crude oil from certain oil

and gas leases in Chambers County and, at the inception of the Howell Action, Howell

deposited the sum of $15,159.81 with the County Clerk of Harris County, Texas.

Thereafter, in February 1993, the Claron Corporation expanded the scope of the Howell

Action by filing a cross-action against JSB Petroleum, Inc. and a third party petition

against a number of parties (the "Third Party Defendants") including the Debtors, Roger

Dugas and Darlene Dugas, and a number of companies which they owned or over which

they apparently exercised control,[4] in which Claron alleged that it was the rightful owner

of the tracts involved in the interpleader action and that the Debtors and the other Third

Party Defendants had conspired to commit fraud with regard to the ownership of such

tracts.[5]  The Third Party Defendants counterclaimed that Claron's asserted interest should

be set aside because such interest was held by Claron solely as the product of a fraudulent

transfer from United Texas Petroleum Corporation and United Texas Corporation, prior to

---

[3]  Ex. P-7.

[4]  These companies included Big Easy Oil and Gas, Inc., Big Easy Oil and Gas II, Inc., other "Big
Easy" oil and gas entities and Faith International, Inc., all of which were scheduled in the Debtors'
Chapter 13 case.  See Ex. P-18.

[5]  See Exhibit "A" to Ex. P-9.

-2-

the merger of those companies into a new entity known as Clamont Energy Corporation ("Clamont") which had subsequently filed for protection under Chapter 11 of the Bankruptcy Code in this Court on September 6, 1989.

On April 19, 1993, another one of the Third Party Defendants removed the Howell Action from the State Court to the United States Bankruptcy Court for the Southern District of Texas, Houston Division, based upon the asserted claim that Claron's interests were, in fact, property of the Clamont bankruptcy estate in the Eastern District.[6]  At approximately the same time, on May 10, 1993, Jason R. Searcy, in his capacity as the duly-appointed trustee of Clamont's Chapter 7 bankruptcy estate (the "Clamont Trustee"), rather than intervening in the Howell Action to prosecute the interests of Clamont, initiated a new adversary proceeding in this Court (the "Trustee Action") against virtually all of the parties in the Howell Action, including Roger and Darlene Dugas, under adversary cause no. 93-1031 in which the Clamont Trustee sought a recovery of all properties transferred from what would have become the Clamont bankruptcy estate.[7]

Thus, the Howell Action and the Trustee Action remained on separate tracks in separate courts, though the issues were related, if not interwoven.  In December 1993, the Clamont Trustee settled the claims of the Clamont estate by selling that estate's right, title and interest in all of the disputed properties to Claron for the sum of $18,750.00.   The

---

[6] Upon removal, this new Southern District adversary proceeding was assigned cause no. 93-4250, which was later referenced in the Trustee Action settlement and by Claron in its pleadings to withdraw funds from the registry of the state court.

[7] Ex. P-12.

Clamont Trustee properly sought approval of that settlement by this Court pursuant to Fed. R. Bankr. P. 9019.[8]   This Court, with the Hon. Donald R. Sharp, presiding, conducted a hearing upon proper notice and approved, over the objection of Mr. Dugas, the Clamont Trustee's settlement and resulting sale to Claron by order entered on February 24, 1994.[9]

However, that adversary proceeding would not expire so easily because, only one day prior to the hearing in the Eastern District regarding approval of the settlement of the Trustee Action, the United States Bankruptcy Court for the Southern District of Texas, the Hon. William Greendyke presiding, entered an order in Houston transferring venue of the removed Howell Action to the Eastern District and unfortunately directed in his order, though undoubtedly executed at the request of the parties, that the Howell Action be docketed in the Eastern District under adversary number 93-1031 — i.e. in the pending Trustee Action — even though, unbeknownst to the transferring court, that adversary proceeding, or at least the Clamont Trustee's interest in it, was on the literal verge of settlement.[10]

Thus, the Howell Action continued its existence under the Eastern District adversary number assigned to the Trustee Action, 93-1031, even though the claims asserted by the Clamont Trustee in that action had been completely settled and

---

[8]  Ex. P-15.

[9]  Ex. P-17.

[10]  See docket entry #61 in adv. proc. no. 93-1031.

-4-

compromised through his sale to Claron.[11]  The Howell Action and the Trustee Action, now consolidated under adversary no. 93-1031, remained relatively dormant from February 1994 through March 1996.

As a result of a transfer of case assignments within this Court, the Hon. Houston Abel assumed responsibility for this case and, on March 5, 1996, Judge Abel issued an "Order Setting Show Cause Hearing" regarding adversary no. 93-1031.  At the conclusion of the show cause hearing, the Court declared that Claron, as a result of its purchase from the Clamont Trustee, had simply received whatever interests the Clamont bankruptcy estate had possessed as to the referenced properties.  The Court further denied Claron's request that it be substituted for the Clamont Trustee as plaintiff in the prosecution of the Trustee Action and be authorized to assert the causes of action brought by the Clamont Trustee in that suit.[12]  Based upon that conclusion, the Court commanded all parties to show cause on April 16, 1996, as to why the consolidated Howell Action-Trustee Action should not be remanded to the original situs of the Howell Action — the County Civil Court at Law No. 1 of Harris County.[13]  Claron Corporation filed its own motion to remand prior to the hearing to which Mr. Dugas objected. Upon proper notice and hearing, the Court issued an order on May 14, 1996 whereupon the consolidated action

---

[11] The Clamont Trustee thereafter continued and ultimately completed his Chapter 7 case administration and an order closing the Clamont bankruptcy case was entered on January 26, 1998.

[12] Ex. P-21 at p. 5.

[13] *Id*. at p. 6.

was remanded back to the State Court and all funds which had been transferred from the state court to the Houston bankruptcy court and then subsequently forwarded to this Court were remitted back to the County Civil Court at Law No. 1 of Harris County, Texas.[14]

With that general background regarding the evolution of these interrelated adversary proceedings in mind, we must now backtrack chronologically to focus upon the developments in this particular bankruptcy case. At the time when the affected parties were awaiting the scheduling of a hearing to consider whether to approve the Clamont Trustee's proposed settlement of the Trustee Action, the present Debtors, Roger and Darlene Dugas, filed in this Court a joint voluntary petition for relief under Chapter 13 on January 10, 1994. In their "Schedule B - Personal Property" filed on January 25, 1994, the Debtors scheduled an account receivable in the following manner:

"JSB Petroleum, Inc. (pending lawsuit)."[15]

On February 9, 1994, Glendon B. Adams, as the duly-appointed attorney for the Claron Corporation, filed a notice of appearance in the Debtors' Chapter 13 case.[16] Two weeks later, on February 22, 1994, Lance Dreyer, as the corporate representative of the Claron Corporation, filed a separate notice of appearance in the Debtors' bankruptcy case.[17]

The Court's docket reveals that very little court activity occurred prior to the time

---

[14] Ex. P-22.

[15] Ex. P-18.

[16] See docket entry #6 of the above-referenced case (94-10027).

[17] See docket entry #7 of the above-referenced case.

that the Debtors confirmed a Chapter 13 plan on July 20, 1994.[18]  Subsequent to the

confirmation, on August 17, 1994, the Claron Corporation filed a motion to transfer venue

of the Debtors' case.[19]  The matter was subsequently dismissed for want of prosecution on

September 15, 1994, when Claron failed to appear at the duly-noticed hearing on the

motion.[20]

At or about that same time, the Claron Corporation obviously learned that, despite

the fact that the Howell Action and all sums in the registry of the State Court relating

thereto had been transferred to the bankruptcy court in Houston and thereafter transferred

to this Court in Beaumont, additional sums had been subsequently deposited in the

registry of the State Court.  Based upon the motion of the Claron Corporation, which

represented to the State Court that it was entitled to all of the sums in the Court's registry

based upon the terms of the settlement with the Clamont Trustee, the State Court on

October 7, 1994 executed an "Order Releasing Funds Held in the Registry of the Court"

in which the State Court directed its clerk to pay the sum of $23,716.43 plus accrued

interest to the Claron Corporation.  The sum of $24,658.33 was paid by the clerk to

Claron on October 14, 1994.[21]

Following the confirmation of their plan, the Debtors turned their attention in their

---

[18]  See docket entry #17 of the above-referenced case.

[19]  See docket entry #19 of the above-referenced case.

[20]  See docket entry #24 of the above-referenced case.

[21]  Ex. P-30 at p. 5.

bankruptcy case to a series of disputes with the Claron Corporation. After having once failed to convince the bankruptcy court to grant a turnover motion asserted against Claron for the ownership of a natural gas engine, the Debtors, on August 22, 1995, filed the present "Motion to Disgorge and Transfer of Funds into the Registry of the Court" in which the Debtors sought an order commanding Claron to disgorge the funds which it had received from the State Court in October and November 1994 and to direct the transfer to the bankruptcy court registry of all remaining funds deposited with the State Court.[22] The Court scheduled a hearing on October 31, 1995, and following the hearing in which the Debtors introduced some thirteen exhibits, this Court, the Hon. Donald Sharp then presiding, entered an order on November 8, 1995, denying the Motion to Disgorge based upon a finding that the Debtors had "totally failed to produce *any* evidence in support of the Motion."[23]

Following the denial of the Debtors' disgorgement motion, Claron again moved the State Court to authorize another transfer of accumulated funds which had been deposited in that court's registry in relation to the now-removed Howell Action. The State Court assented and, on December 8, 1995, the State Court clerk forwarded $14,778.46 to Claron, consisting of a principal amount of $13,278.89, plus accrued

---

[22] As the Fifth Circuit subsequently noted, the fact that this removal of funds actually forms the basis of the disgorgement motion is not readily apparent from its face. Ex. P-24 at p. 6.

[23] See docket entry #52 of the above-referenced case (emphasis added).

-8-

interest of $1,499.57.[24]

The Debtors meanwhile had appealed the denial of their disgorgement motion to the United States District Court for the Eastern District of Texas, which subsequently affirmed the bankruptcy court's decision by concluding that the Debtors could not properly prosecute such a motion in their personal Chapter 13 case, but rather could do so only in the Trustee Action.  The Debtors then appealed that affirmance to the United States Court of Appeals for the Fifth Circuit wherein they prosecuted the appeal without any appearance from any appellee.

As the Debtors' appeal of the disgorgement motion worked its way through the appellate process, Judge Abel, having assumed responsibility for the Beaumont docket, remanded the consolidated Howell Action-Trustee Action back to the State Court on May 14, 1996,[25] and Claron immediately sought on May 30, 1996, a third transfer of funds from the State Court's registry — based this time upon the erroneous assertion that "[a]ll pending action in this Case and all related cases has been compromised and dismissed and the case is closed."[26]  The state court case had been closed due to its earlier removal to the Houston bankruptcy court in early 1994, but Claron failed to disclose to the State Court that the action was returning from Beaumont to its original situs and Claron's assertion that all of the cases had been compromised was certainly fallacious since the various

---

[24]  Ex. P-30 at p. 3.

[25]  Ex. P-22.

[26]  Ex. P-23.

claims asserted by all of the parties to the original Howell Action, to which Clamont was not a party, and which included competing ownership claims to the funds originally placed in the registry of the State Court, had not yet been adjudicated.[27]  Nevertheless, and presumably without having been apprised of the true circumstances of the case, the State Court granted the motion and, in response thereto, the State Court clerk forwarded the sum of $36,662.33 to Claron on June 10, 1996.[28]

On March 3, 1999, the Fifth Circuit reversed the decision of the District Court and remanded the Debtors' "Motion to Disgorge and Transfer of Funds into the Registry of the Court" back to this Court for reconsideration with the assistance of a written opinion.[29] After generally reciting the complicated procedural history outlined above, the circuit panel found that, although the Debtors may not have introduced evidence sufficient to prevail on their disgorgement motion, they had introduced evidence sufficient to require a reversal of the bankruptcy court's finding that the Debtors had failed to introduce any evidence relating to Claron's removal of funds from the registry of the Harris County court.[30]  The Circuit further concluded that removal of the funds *may* have constituted a violation of the §362(a) automatic stay arising as a result of the Dugas' bankruptcy case and that, accordingly, the motion could be properly brought in the Dugas' personal

---

[27]  The Fifth Circuit recognized in its eventual opinion that the settlement of the Trustee Action "did not purport to resolve what interest Claron then held vis-a-vis the Dugas (sic) or any of the other original parties in Howell," Ex. P-24 at p. 4, and that "Claron's removal of the funds was ostensibly improper." *Id*. at p. 9.

[28]  Ex. P-30 at p. 4.

[29]  Ex. P-24.

[30]  *Id*. at pp. 8-9.

bankruptcy case.[31]  Finally, the Circuit declared that,

> ...[a]lthough the motion [for disgorgement] did not lay out with specificity the Dugas' statutory basis for seeking disgorgement of the funds removed by Claron, we find that a suit seeking relief from acts that impair the property of a bankruptcy estate is presumptively an action to enforce the automatic stay.[32]

The Circuit concluded its opinion by noting that it is the automatic stay arising from the Dugas' bankruptcy filing which generates the Debtors' potential claims in this case, and it expressed its concerns that the funds were released to Claron though "neither the settlement agreement nor any other determination of the bankruptcy court appeared to extinguish or resolve the Dugas' claimed interest to the same funds."[33]  Accordingly, the Circuit reversed the decisions of the lower courts and remanded this motion back to this Court for reconsideration.

During the appellate process regarding the disgorgement motion, the Debtors had completed all payments proposed to be made under their confirmed Chapter 13 plan and, on January 27, 1996, an order of discharge under Chapter 13 was entered by this Court in favor of the Debtors.[34]  This Chapter 13 case was thereafter closed on February 28, 1997.

---

[31]  *Id.* at p. 9 wherein the Circuit noted that "To the extent that Claron's removal of the funds from [the] Harris County court illegally impaired *the Dugas's interest* to the same funds, that removal *may* have constituted a violation of the §362(a) stay provisions." (emphasis added).

[32]  *Id.* at p. 11.

[33]  *Id.* at p. 12.

[34]  See docket entry #67 of the above-referenced case

**-11-**

Upon receipt of the appellate decision and mandate, this Court, on April 11, 1999, issued a notice which reset the motion for disgorgement for hearing with proper notice to all parties on the Debtors' matrix of creditors.[35]  The Debtors did not appear in prosecution of their motion and the Court dismissed the motion for want of prosecution.  The Debtors appealed that decision to the United States District Court and, by a decision entered on November 3, 1999, the District Court reversed this Court's dismissal of the motion for want of prosecution.[36]

Upon yet another remand, this Court subsequently set another hearing to consider the Debtors' motion with due notice to all parties, including Claron Corporation, through its designated person for notice, Glendon B. Adams.  Pursuant to the Fifth Circuit directive, the Court construed the dispute as an action to enforce the automatic stay and for the assessment of damages for the asserted willful violation of the automatic stay by the Claron Corporation.[37]  The Debtors appeared at that time.[38]  Claron Corporation did

---

[35]  See Ex. P-1-A — the "Order Reopening Chapter 13 Case for Limited Purpose Without Appointment of Trustee" — an order entered *sua sponte* which reopened the underlying bankruptcy case for the limited purpose of determining the motion for disgorgement and any related requests for relief, as of the date of the Fifth Circuit's mandate, such being March 25, 1999.

[36]  See Ex. P-1-B.  It must be noted that it is clear from the text of the order that Judge Fisher (perhaps understandably) had confused who had purportedly done what and incorrectly referenced the Clamont Trustee, Jason Searcy, as the party who had removed funds from the Harris County court.

[37]  At the initial hearing, the Debtors also orally requested the Court to resolve all of the conflicting claims in the interpled funds.  However, that request for relief was not contained nor even remotely referenced in the Debtors' motion, thus raising serious due process concerns.  Additionally, as a legal matter, such request could not have been brought as a contested matter in any event, as can an action for a willful violation of the automatic stay under §362(k), since such relief is only available through the filing of an adversary complaint under Fed. R. Bankr. P. 7001 and the invocation of the greater procedural protections offered in an adversary context.  Both legally and practically, the consolidated Howell Action-Trustee Action, which was remanded to state court in 1996, is the proper venue for the

not appear.  Based upon the uncontested evidence submitted, including the Debtors'

claims of ownership of the escrowed funds, the Court found that Claron Corporation had

violated the automatic stay by obtaining funds from the state court registry on at least

three occasions without obtaining stay relief and it issued an order on August 24, 2001,

that awarded the Debtors actual damages of $1,020 and punitive damages of $30,000

against Claron (the "Initial Order").[39]  The Initial Order also ordered Claron to return the

$96,806.19 plus interest to the registry of the State Court.

The Initial Order understandably gained Claron's attention.  Unfortunately, Claron

deferred the filing of a motion for reconsideration or for new trial in favor of the filing of

a Notice of Appeal which it filed on September 4, 2001.[40]  Claron waited another month,

until October 4, 2001, to file a motion for relief from judgment under Rule 9024.[41]  Since

the Initial Order had been appealed prior to the filing of the Rule 9024 motion, the Court

conducted the hearing on the motion for relief from judgment pursuant to the procedure

---

determination of the competing claims.  Further, because a discharge was granted to the Debtors in this
case in 1997, all bankruptcy case administration involving these Debtors has ended, and because this case
was reopened only for the limited purpose of determining this motion, the idea that federal jurisdiction is
still available under 28 U.S.C. §1334 for the adjudication of the conflicting claims to the interpled funds
seems dubious.  Thus, no legitimate purpose would be served by the transfer of funds back to the registry
of this Court.

[38]  The Clamont Trustee also appeared at the hearing.

[39]  See Ex. P-1-B.

[40]  See docket entry #173 of the above-referenced case.

[41]  See docket entry #188 of the above-referenced case.  Claron sought Rule 9024 relief claiming
that it was not properly notified of the developments resulting in the new bankruptcy hearing of the
disgorgement motion and that the Dugases had materially misrepresented to the Court that they held
claims to the interpled funds in their individual capacities.

and authority outlined in *Winchester v. United States Attorney*, 68 F.3d 947 (5th Cir. 1995) and *In re Fraser*, 98 F.Supp.2d 788 (E.D. Tex. 2000).

The evidence offered at the hearing on the Rule 9024 motion differed considerably from that offered at the uncontested hearing that gave rise to the Initial Order. Specifically, the evidence supported Claron's contention that there could have been no stay violation arising from its receipt of the interpled funds because Mr. Dugas and his wife owned no claim to such funds in their individual capacities. Upon direct examination as an adverse witness at the hearing, Mr. Dugas testified that his claim was not based upon any individual ownership claim to the properties from which the funds arose but rather that he wished to press a claim for such funds only because "it's my understanding that I would be able to get my attorney fees for the frivolous lawsuit that you all [Claron] filed against me in state court."[42]  In seeking to clarify further the source of the right which the Debtors were asserting against the registry funds [and which thereby stood as the foundation from which the Debtors could assert a stay violation] the following colloquy ensued in the adverse examination of Mr. Dugas:

Mr. Adams (Claron's counsel):      Would you tell the Court what is the basis upon which you claim ownership into any of these proceeds?  How are you an owner?  How did you become an owner of these proceeds?

---

[42]  See docket entry #217 of the above-referenced case at p. 3:16-18.  Mr. Dugas is referencing the fact that Claron had filed a third party action against him for fraud in the Howell Action in 1993.  *See supra* note 5.

-14-

| | |
|---|---|
| Mr. Dugas (as witness): | Those monies was (sic) to be in the registry of the Court pending the final outcome of this adversary, which hadn't been finalized yet. And when it comes down to it, I can get attorneys fees out of it and my cost for what you all have done.[43] |

• • •

| | |
|---|---|
| The Court: | You have claimed, in your schedules, with regard to the claims you have asserted in these various pieces of litigation, that you are — that you and your bankruptcy estate therefore are entitled to the proceeds — some of the proceeds of the sum that are in — or the runs that were in the registry of the Court. |
| Mr. Dugas: | Yes sir. |
| The Court: | All right. The question is - - notwithstanding attorney's fees. I'm not talking about attorney's fees for frivolous lawsuits. I'm not talking about any alternative or other alternative relief you might have sought, the question that's attempted — that has been forwarded to you is what claim — not attorney's fees — what <u>claim</u> do you have of ownership to, based upon the leases, to the runs that are derived from those leases? |
| Mr. Dugas: | I don't have any. |

• • •

| | |
|---|---|
| Mr. Adams: | Sometimes in your pleadings you have said that Claron has no title to these funds. Do you remember pleading that in different motions you've filed with the Court? |
| Mr. Dugas: | True. |
| Mr. Adams: | Why would that be true? |
| Mr. Dugas: | They don't have title. |

---

[43] It must be recalled that the Howell action was initiated to determine competing claims to proceeds arising from the sale of crude oil primarily from the State Tract 55 lease in Chambers County. Mr. Dugas later admitted in the reconsideration hearing that neither he nor his wife owned any interest in State Tract 55 in their respective individual capacities and that, therefore, they had not listed any mineral interest in State Tract 55 in their schedules.

-15-

Mr. Adams:     Then who does?

Mr. Dugas:     Well, it's still in JSB Petroleum's name until after the litigation is over with.

Mr. Adams:     But isn't it true that there's absolutely no evidence of title in your name or your wife's name anywhere?

Mr. Dugas:     It's in the corporate name.

The Court:     He asked you "in your name or your wife's name."

Mr. Dugas:     None.[44]

Thus, it was disclosed for the first time at the Rule 9024 hearing that Mr. and Mrs. Dugas did not actually own an individual interest in the properties from which the moneys in the State Court registry were derived, but rather they based their claims to those registry funds solely through their capacities as shareholders in JSB Petroleum, Inc. Nothing was mentioned at that hearing about any verbal assignment of interest from JSB or Jeff Buescher to the Dugases.

In light of the limited scope of the reconsideration hearing and the pendency of the appeal by Claron, the Court issued notice of its intent to grant Claron's motion for relief from judgment upon remand or other disposition by the District Court.[45] Claron subsequently filed a motion with the District Court to remand its earlier appeal of the Initial Order back to this Court and, upon granting of that motion,[46] this Court granted

---

[44]   See docket entry #217 of the above-referenced case at pp. 3-7.

[45]   See docket entry #211 of the above-referenced case.  The court also granted a stay of the effectiveness of the Initial Order pending resolution of the appeal.  See docket entry #209.

[46]   See docket entry #218 of the above-referenced case.

Claron's motion and vacated the Initial Order on August 27, 2002.[47]

After a considerable delay imposed as a result of actions taken in other courts[48] and the parties' subsequent attempt to settle their dispute outside the province of the court,[49] the Court again reset this matter for hearing.[50]  The evidence tendered at this hearing reinforced the information gained at the Rule 9024 hearing regarding the Dugas' interest,

---

[47]  See docket entry #220 of the above-referenced case..

[48]  Mr. Dugas appealed the vacating of the Initial Order.  The decision was affirmed by the district court and subsequently affirmed by the Fifth Circuit with a finding that the appeal by Mr. Dugas was frivolous.  Notwithstanding that finding, Mr. Dugas sought a writ of certiorari from the Supreme Court of the United States which was denied.  *See Dugas v. Claron Corp. (In re Dugas)*, 115 Fed. Appx., 2004 WL 2375909 (5th Cir. Oct. 19, 2004), *cert. denied*, 544 U.S. 1032 (May 16, 2005), *r'hrg denied,* 545 U.S. 1154 (Aug. 1, 2005).  Simultaneously, Mr. Dugas sued the undersigned judge in his individual capacity in Texas state court, alleging that the vacating of the Initial Order was outside the scope of judicial immunity, thereby rendering the judge personally liable for all of the previously assessed damages.  That lawsuit was removed to federal district court and subsequently dismissed as frivolous.  The Fifth Circuit affirmed that dismissal and sanctioned Mr. Dugas $500 for a frivolous appeal.  Again, Mr. Dugas sought a writ of certiorari which was denied.  *See Dugas v. Parker*, 124 Fed. Appx. 824, 2005 WL 323732 (5th Cir. Feb. 10, 2005), *cert. denied*, 546 U.S. 871 (Oct. 5, 2005).

[49]  After the above-referenced appeals were exhausted (and the Court ultimately notified of the decisions), the Court reset the matter for hearing in August, 2007.  At that hearing, the parties announced a settlement on the record.  Over the next several months the parties made unsuccessful efforts at consummating their settlement agreement.  Finally, Mr. Dugas decided that the settlement was not viable and filed a motion to reinstate the 2001 judgment. The entire matter was set yet again for hearing in November, 2008.

[50]  The Court reset for hearing the claims asserted in the original "Motion to Disgorge and Transfer of Funds into the Registry of the Court," notwithstanding the fact that the Debtors had filed a new pleading in 2008 entitled "Motion to Revise and Re-Enter August 24, 2001 Judgment and Request for Punitive Damages" in which they sought to expand the scope of the new hearing to include requests for an award of substantial damages against the Clamont Trustee, Mr. Searcy, and new punitive damage requests against Glendon Adams and Lance Dreyer.  Although the Debtors orally withdrew all requests for remedies against Mr. Searcy arising from the new pleading at the beginning of the reset hearing, the Court supplemented that withdrawal by making specific oral findings on November 18, 2008, incorporated into these findings by reference, that all new requests included in the Debtors' new 2008 motion were outside the limited scope for which the case had been reopened pursuant to the Circuit's mandate, that no leave had been sought nor granted to amend the pleadings, and that most of the claims were barred by the doctrine of *res judicata* in any event.  As a result, all new requests for relief not substantially contained in the original motion to disgorge have been denied.

or lack thereof, in the funds held in the state court registry.   Mr. Dugas offered a number

of exhibits, but no testimony in support of his motion.  When called as an adverse witness

in Claron's case-in-chief, Mr. Dugas again acknowledged that neither he nor his wife held

any individual interest in the interpled funds at any time nor did they ever individually

own an interest in the properties from which the production proceeds were derived.

Instead, he claimed an entitlement to be paid for the services rendered by certain of his

corporations in operating the subject properties while the production proceeds were

subject to suspense.  According to Mr. Dugas, "those funds were generated by my

corporations," and the claim in their schedules of an account receivable "represents my

time and work on behalf of those corporations."

Later in his testimony, Mr. Dugas raised a new basis of ownership that he had

never previously claimed — a verbal assignment from Jeff Buescher, the president of JSB

Petroleum, Inc.  Mr. Dugas baldly asserted that, in exchange for the above-described

work, "I got the rest of the lawsuit," although he admitted that there was no written notice

given to any party of any such assignment of interest in the lawsuit to him or his wife by

either Buescher or JSB Petroleum, Inc.  In fact, Mr. Dugas admitted that there was no

written assignment or agreement to transfer anything at all by Buescher or JSB.  Instead,

Mr. Dugas asserted that Jeff Buescher had verbally agreed at some point prior to the

Dugas' bankruptcy filing to give him JSB Petroleum's interest in the lawsuit in

recognition of the services rendered on the referenced leases by the Dugas' companies.

Nothing in the record corroborates the existence of such a verbal agreement — a

contention that had never been presented prior to the 2008 hearing.

## Discussion

*§362(k)*

When a bankruptcy petition is filed, an automatic stay immediately becomes effective and operates as a self-executing injunction that prevents creditors from pursuing any collection efforts against the debtor for pre-petition debts.  *Campbell v. Countrywide Home Loans*, 545 F.3d 348, 354-355 (5th Cir. 2008).  However, the automatic stay protects creditors as well as debtors.  *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 301 (5th Cir. 2005).  As the Fifth Circuit explained in *Chesnut*, "Without the stay, creditors might scramble to obtain as much property of the debtor's limited estate as possible.  The automatic stay prevents this scramble by providing 'breathing room' for the debtor and the bankruptcy court to institute an organized repayment plan."  *Id.* (citing *In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004)).

Because the protections afforded by the automatic stay are so integral to the goals of the bankruptcy process, Congress gave debtors a private right of action to sue for violations of the stay, now codified as 11 U.S.C. §362(k),[51] which provides:

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

---

[51]  Due to the addition of certain provisions in §362 by the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 during the pendency of this dispute, the old "§362(f)" has now been re-designated as "§362(k)."

**-19-**

11 U.S.C. §362(k)(1); *see Pettitt v. Baker*, 876 F.2d 456, 457 (5th Cir. 1989).  This

Circuit has held that a "willful" violation does not require proof of a specific intent to

violate the automatic stay.  *See Chesnut*, 422 F.3d at 302.   "Rather, the statute provides

for damages upon a finding that the defendant knew of the automatic stay and the

defendant's actions which violated the stay were intentional."  *Id.*  Furthermore, "whether

the [defendant] believes in good faith that it had a right to [act contrary to the statute] is

not relevant to whether the act was 'willful' or whether compensation must be awarded."

*Id.*

　　　Accordingly, the Dugases must demonstrate by a preponderance of the evidence

the existence of three elements in order to establish a claim under §362(k): (1) Claron

must have known of the existence of the stay; (2) Claron's actions were taken

intentionally; and (3) those actions constituted stay violations.  *Young v. Repine (In re

Repine)*, 536 F.3d 512, 519 (5th Cir. 2008).

　　　Claron is charged with knowledge of the automatic stay.  The knowledge of a

pending bankruptcy case constitutes knowledge of the automatic stay,  *In re D'Alfonso*,

211 B.R. 508, 517 (Bankr. E.D. Pa. 1997), and the docket of the Court clearly indicates

that, less than a month after the filing of the Debtors' case and some eight months prior to

its first withdrawal of registry funds, a corporate representative and the attorney for the

Claron Corporation filed separate notices of appearance in the Debtors' Chapter 13 case.[52]

---

[52]　　See docket entries #7 and #8 of the above-referenced case.

Further, prior to the first of its three successful seizures of the state court registry funds,

Claron had filed a motion to transfer venue of the Debtors' Chapter 13 case to the

Southern District of Texas.[53]  Thus, a mere cursory review of the Court's docket is

sufficient to demonstrate that the Claron Corporation knew of the existence of the Dugas'

bankruptcy case at the time that it sought the transfer of the interpled funds.

Secondly, Claron Corporation does not dispute that it intentionally sought the

withdrawal of the state court registry funds.  Indeed it has consistently sought to justify

those actions, not to deny them.  Claron has maintained that it had a right to the interpled

funds as a result of the settlement which it had reached with the Clamont Trustee and that

such action could not have affected any interest individually owned by either Mr. and

Mrs. Dugas.  Notwithstanding the relative merits of its position, Claron has never denied

intentionally taking the actions of which the Dugases complain.

As to the third element necessary to establish a claim under §362(k), one must look

first to the statute to establish the parameters of the stay.  Section 362(a) of the

Bankruptcy Code prohibits certain categories of actions.  *See* 11 U.S.C. §362(a)(1)-(8).

Among the categories of prohibited action is "the commencement or continuation . . . of a

judicial, administrative, or other action or proceeding against the debtor that was or could

have been commenced before the commencement of the case under this title [Title 11,

United States Code], or to recover a claim against the debtor that arose before the

---

[53]   See docket entry #19 of the above-referenced case.  The motion was dismissed for want of prosecution and was never determined on its merits.

commencement of the case. . . ."  11 U.S.C. §362(a)(1).  Section 362 also prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[54]  11 U.S.C. §362(a)(3).

However, the evidence presented by the Debtors falls significantly short of that required to establish that the interpled funds actually constituted property of their joint bankruptcy estate.  The evidence establishes that the Debtors had no direct ownership interest in the interpled funds.  In fact, the evidence fails to establish by a preponderance of the evidence that the Debtors even held the purported account receivable from JSB Petroleum, Inc. as asserted in their schedules.  If an account receivable actually existed at all, it was held by one or more of the corporations in which the Debtors held an ownership interest.  There is insufficient proof to demonstrate that Mr. and Mrs. Dugas individually prosecuted any claim to the interpled fund.  Even if the Debtors had successfully demonstrated that they held in their individual capacities an account receivable against JSB Petroleum, the existence of such a receivable alone did not provide the Debtors with any particularized claim to or lien against the interpled funds.  It merely meant that, if JSB managed to prevail upon the ultimate resolution of the Howell Action, those sums could have provided to JSB a pool of cash from which JSB debts could be paid.  The fact that Dugas' companies might have asserted claims against JSB Petroleum if JSB's claim to the interpled funds had been vindicated does not render the underlying funds as property of

---

[54] Property of the estate is defined in 11 U.S.C. 541(a)(1) as "all legal or equitable interests of the debtor in property as of the commencement of the case."

the Dugas' bankruptcy estate.

Additionally, the Dugas' assertion that JSB or Buescher orally assigned to them all rights held by JSB arising out of the Howell Action is not credible.  This is a proposition which the Debtors never even presented prior to 2008.  It is not corroborated in any fashion.  In fact, its purported existence as a property interest owned by the Debtors is omitted entirely from their schedules and is inconsistent with the scheduled claim of an account receivable to be paid by JSB.  It is not supported by any document or testimony from the Buescher bankruptcy.  It is also contradicted by Mr. Dugas' earlier statements in this case regarding the nature of his claims.  Because the Debtors have failed to present sufficient evidence to establish that the interpled funds actually constituted property of their bankruptcy estate, their claims that the withdrawal of funds from the state court registry by Claron constituted a violation of either §362(a)(1) or §362(a)(3) must fail.

Notwithstanding the fact that the Debtors have now failed to establish that the interpled funds actually constituted property of their bankruptcy estate, it is still possible to construe Claron's unilateral actions to withdraw the funds from the state court registry as a series of stay violations under §362(k).  The Fifth Circuit has recognized that a creditor may violate the automatic stay if it unilaterally seizes, without the permission of the bankruptcy court,  property to which a bankruptcy estate may have only an *arguable* claim.[55]  *Chesnut*, 422 F.3d at 298.   It observed that "[t]he policy and structure of the

---

[55]  The Circuit acknowledged that §362 "does not make clear whether its protection extends to property with uncertain status at the time of the act of possession."  *Chesnut*, 422 F.3d at 303.

-23-

Bankruptcy Code suggest that the stay covers *at least some* arguable property,"[56] and that the breadth of the automatic stay "suggests Congressional intent that, in the face of uncertainty or ambiguity, courts should presume protection of arguable property."[57]  In other words, the stay provisions "suggest a preference for adjudication rather than seizure."[58]

Yet the Fifth Circuit did not say that all arguable property is protected by the stay. It specifically observed that "[n]ot every bankruptcy petition, with an attendant claim of a right in property, will transform what is obviously not property of the estate into arguable property that is subject to process requirements."[59]  This echoes the earlier warning issued by the bankruptcy court in which the arguable interest in *Chesnut* was first found to be protected by the provisions of the automatic stay.  As Judge Lynn observed, this principle "is not an invitation to debtors to make frivolous and baseless claims of ownership to property" and he warned that sanctions would be appropriate against debtors who brought stay violation claims based upon "transparently baseless" claims.  *In re Chesnut*, 300 B.R. 880, 888 (Bankr. N.D. Tex. 2003).

Upon careful review, the Court cannot characterize the Dugas claim to the interpled funds as so transparently baseless or frivolous as to have freed Claron from

---

[56]  *Id*. (emphasis added).

[57]  *Id*.

[58]  *Id*. at 304.

[59]  *Id*. at 306.

seeking an adjudication of those asserted debtor rights before this Court.  Though upon

adjudication of this dispute the Court has found insufficient evidence of the existence of

any property right held by the Debtors as against the interpled funds, it is clear that Claron

had notice of the Debtors' bankruptcy filing and it is also charged with notice that the

Debtors had asserted some type of claim against the "pending lawsuit" in Harris County

in their schedules.  As it turns out, Claron was correct in its assessment that the Debtors'

claim of interest was unsubstantiated, but that assessment provides no safe harbor for

Claron in this circumstance.

Upon notice of the disputed claim proffered by the Debtors, which it could have

legitimately evaluated as frivolous, Claron still should have brought the dispute over the

validity of the Debtors' asserted interest in the interpled funds to the bankruptcy court for

adjudication, rather than unilaterally seizing the funds without the permission of the

bankruptcy court.  As demonstrated in the Rule 9024 hearing and in this final

adjudication, Claron could have quickly established in a stay hearing that the Debtors had

no legitimate ownership interest in the actual res being held by the state court and relief

could have been quickly and effectively granted in its favor.  That process would have

actually benefitted Claron, but it chose instead to make a unilateral assessment of the

invalidity of the Debtors' claims and to take the unilateral action of accessing the

interpled funds without any involvement of the bankruptcy court.  That type of

independent action is precisely what the *Chesnut* court was trying to prevent.  As it

observed,

> If a creditor wishes to seize property . . . , he cannot do so first and thereby
> force the debtor to vindicate his rights after the seizure.  Instead, he must
> first seek relief from the bankruptcy court.  Where seized property is
> arguable property, it is no answer for the creditor to defend the [unilateral
> action] by claiming that the property was not properly covered by the stay.

*Chesnut*, 422 F.3d at 304.

Because Claron, at least as to the first acquisition of funds in October 1994,[60] elected to

forego any submission of the dispute over this arguable property right to the bankruptcy

court for adjudication through the stay relief processes of §362(d), it willfully violated the

automatic stay and is subject to sanction for that singular violation.

*Damages*

Section 362(k) provides that "an individual injured by any willful violation of a

stay provided by this section shall recover actual damages, including costs and attorneys'

fees, and, in appropriate circumstances, may recover punitive damages."  As this Court

has recently observed:

> [E]ven if the evidence establishes the existence of a willful stay violation, a
> debtor must still establish actual damages, though the damage provisions of
> §362(k) are stated in mandatory terms. . . .  An award of actual damages
> under §362(k) must have a sufficient factual foundation . . . [and] must be
> proven with reasonable certainty and may not be speculative or based on
> conjecture.

---

[60]  By the time that Claron made its second attempt to withdraw interpled funds in November,
1995, the bankruptcy court had already denied the Debtors' motion to compel Claron to disgorge the
funds it had previously appropriated.  Thus, the second and third withdrawals of funds both occurred *after*
a formal (and ultimately correct) judicial determination by Judge Sharp that the interpled funds did not
constitute property of the bankruptcy estate and, accordingly, could not have been protected by the
automatic stay.

*Collier v. Hill (In re Collier)*, 410 B.R. 464, 470-71 (Bankr. E.D. Tex. 2009).

The quantification of actual damages in this case is rather problematic.  To the extent that the Debtors contend that they are entitled to a recovery of actual damages in the amount of the October 1994 withdrawal from the state court registry totaling $24,806.19, plus applicable interest,[61] they could rightfully be said to have sustained such damages only if they had previously been declared the rightful owners of the funds in the State Court registry.  No such judicial declaration has ever been issued.  Any assessment based upon a conclusion that the Debtors have sustained actual damages equivalent to the total amount of improperly-seized funds would be sheer speculation and such speculation does not establish a proper foundation for the assessment of damages under §362(k).  *In re Archer*, 853 F.2d 497, 499-500 (6th Cir. 1988)[holding that damages must be proven with reasonable certainty and may not be speculative or based on conjecture.]; *Sculky v. I.R.S. (In re Sculky)*, 182 B.R. 706, 708 (Bankr. E.D. Pa. 1995) ["Damages for a willful violation of the stay may not be awarded based on speculation and guess work."].  Under such standards, the only actual damages which the Debtors have incurred as a result of Claron's singular stay violation have been the $1,020 in costs that they have proven.[62]

---

[61]   See Ex. P-30.

[62]   See Ex. P-32.  Though §362(k) also permits a recovery of attorney's fees, the Debtors in this case acted in a *pro se* capacity and, in this circuit, statutory attorneys' fees cannot be awarded to pro se litigants, such as the Debtors, unless such a person is, in fact, an attorney.  *McLean v. Int'l Harvester Co.*, 902 F.2d 372 (5th Cir. 1990)[construing the availability of pro se attorneys' fees under Delaware corporation law]; *Cazalas v. United States Dept. of Justice*, 709 F.2d 1051 (5th Cir. 1983)[construing the same under the Freedom of Information Act]; *Barrett v. Bureau of Customs*, 651 F.2d 1087 (5th Cir. 1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 165 (1982)[construing the FOIA and the Privacy Act under Title 5, United States Code].  Therefore, the Debtors cannot recover attorneys' fees in

Finally, the Debtors seek an award of punitive damages against Claron.  Section 362(k) provides that an individual injured by a willful violation of the automatic stay ". . . *in appropriate circumstances*, may recover punitive damages." (emphasis added).  Such damages are generally designed to cause a change in the creditor's behavior, *Heghmann v. Indorf (In re Heghmann)*, 316 B.R. 395, 406 (B.A.P. 1st Cir. 2004) and serve as a deterrent to certain actions of creditors.  Punitive damages are awarded in this context only where the conduct is egregious or vindictive.  *Id; Davis v. Matt Gay Chevrolet, Inc., (In re Davis)*, 374 B.R. 366, 373 (Bankr. S.D. Ga. 2007).  The Fifth Circuit recently endorsed the egregious conduct standard and confirmed that the existence of "appropriate circumstances" for the application of punitive damages under §362(k) requires a finding of "egregious, intentional misconduct on the violator's part."  *Repine*, 536 F.3d at 521.

In this "arguable property" context, one must be reminded that the actual damage award for a stay violation has been assessed against Claron in this case as to a property interest that was, in fact, never owned by the Debtors and was never property of the bankruptcy estate.  That actual damage award is warranted, however, based upon the failure of the creditor to seek the termination or modification of the automatic stay, even though the applicability of the stay was subject to serious dispute and though the creditor's assessment regarding the invalidity of a debtor's claims regarding that arguable property has been ultimately vindicated.  While the assessment of actual damages is

---

this instance as a matter of law.  *Dumdei v. Certified Financial Planner Bd. of Standards, Inc.*, 1999 WL 787402, *8 (N.D.Tex.1999).

certainly appropriate for Claron's unwarranted decision to initiate unilateral action against the interpled funds instead of initiating stay litigation, that miscalculation in this context cannot be properly described as egregious conduct. While there might be a circumstance in which the assessment of punitive damages might be appropriate in a stay violation involving arguable property, this is certainly not such a case and an assessment of punitive damages should not be rendered merely because the actual damage award is rather marginal.

Accordingly, the Court concludes that the Debtors, Roger Dugas and Darlene Dugas, shall recover from Claron Corporation actual damages in the sum of $1,020.00, with post-judgment interest on such sums at the current federal post-judgment interest rate of 0.39% until paid.[63]  All other requests for relief are denied.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[64] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary

---

[63]  The Court declines to award pre-judgment interest in this particular context. Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute. *Matter of Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1993). Federal courts apply a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act. *Id.* While the Court believes that it possesses the discretion in this context to award pre-judgment interest since there is no preclusion referenced in the statute and an award could enhance the policies embraced by §362(k), it declines to do so in this instance in light of the fact that the Debtors knew or should have known that they possessed as individuals no property interest in the interpled funds as opposed to their litigation position, the fact that much of the delay is rightfully attributable to the actions of the Debtors, that amount which could be assessed under the applicable rate would have a *de minimis* effect on statutory policies, and that the basis of the monetary award pertains primarily with the relationship of Claron with the Court as opposed to any improper actions taken against the Debtors.

[64]  To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby

proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052.  An appropriate order shall be

entered which is consistent with this opinion.


Signed on 10/13/2009

_____
THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

adopted as such.  The Court reserves the right to make additional findings and conclusions as necessary or
as may be requested by any party.